In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1794

JEROME L. WEINMANN and SUSAN WEINMANN,

*Plaintiffs-Appellees*,

*v.*

PATRICK MCCLONE,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-C-0088 — **William C. Griesbach**, *Chief Judge*.

ARGUED OCTOBER 27, 2014 — DECIDED MAY 27, 2015

Before WOOD, *Chief Judge*, and EASTERBROOK and
WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. After an argument with his wife on
their wedding anniversary, Jerome Weinmann went to his
garage, drank half a bottle of vodka, and put the barrel of a
shotgun in his mouth. But he was unable to pull the trigger.
Susan Weinmann, in the meantime, had called 911 for help.
She got more than she bargained for: the officer who re-
sponded to her call, Deputy Patrick J. McClone, shot Jerome

four times. Jerome survived and sued McClone under 42 U.S.C. § 1983 for using unconstitutionally excessive force. McClone invoked qualified immunity, but the district court refused to grant summary judgment in his favor on that basis. He has taken an interlocutory appeal from that order, as he is permitted to do, see *Mitchell v. Forsyth*, 472 U.S. 511, 525–26 (1985). We conclude, however, that the district court correctly ruled that McClone is not entitled to qualified immunity based on the current record. We therefore affirm.

**I**

An appeal from a ruling on qualified immunity is not the time for the resolution of disputed facts. Instead, as is generally true when summary judgment is involved, we accept the plaintiff's version of the facts, without vouching for their ultimate accuracy. *Jewett v. Anders*, 521 F.3d 818, 819 (7th Cir. 2008). We already have sketched out the basic story, but it is helpful to add a few more details.

When Susan called 911 on November 12, 2007, she told the dispatcher that her husband Jerome was in the garage, he was threatening to kill himself, and he had access to a long gun. (We refer to the plaintiffs by their first names to avoid confusion.) Susan added that she did not know if he had any ammunition. The dispatcher relayed all of this information to the responding officer, Deputy McClone of the Waupaca County Sheriff's Department.

Within three minutes of arriving at the Weinmann home, McClone decided that a forced entry into the garage was necessary. He peered into the garage from two windows on the west side of the building, but Jerome was not in sight. McClone deduced that Jerome was in the southwest corner

of the structure, because it was the only area that was not visible from the two windows McClone had chosen to use. (There were other windows.) McClone then knocked on the door to the garage, but there was no response. He did not try to speak to Jerome through the door. Instead, he decided to make an unannounced entry into the garage. Hearing something that sounded like pattering on cupboard doors and fearing that Jerome was attempting to commit suicide, McClone kicked in the door.

The parties dispute what happened next. According to Jerome, right before McClone entered, Jerome had lifted the .12 gauge shotgun, banged it against his forehead, and "return[ed] the shotgun to its resting place." At that point Jerome was sitting in a lawn chair with the shotgun across his lap resting on the "armrests or held just above them." Jerome said that he "never pointed the gun at Deputy McClone, and he never did anything whatsoever to make Deputy McClone reasonably believe that the deputy or anyone else was in threat of harm." McClone too recalled that Jerome never pointed the gun at him, but McClone urges that "it is undisputed that Deputy McClone perceived the weapon as being pointed in his direction." It is undisputed that McClone then discharged his weapon, shooting Jerome four times, in the face, thumb, and torso. Jerome's injuries required extensive medical treatment including partial amputation of his thumb and a total replacement of his jaw's left temporomandibular joint.

In the wake of these events, Jerome and Susan filed this section 1983 case against McClone and Waupaca County, seeking compensatory and punitive damages for violation of Jerome's constitutional rights. The district court granted the

County's motion to dismiss the Weinmanns' claim against Waupaca County, see *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), but it denied McClone's motion to dismiss the excessive force claim, concluding that a material dispute of fact precluded a finding of qualified immunity.

## II

Normally a denial of summary judgment is not a final decision appealable under 28 U.S.C. § 1291, but there is a "well-established exception to this general rule under the collateral order doctrine where a party challenges a district court's determination that a government official is not entitled to qualified immunity." *Gibbs v. Lomas*, 755 F.3d 529, 535 (7th Cir. 2014) (citation omitted). When the denial of summary judgment is grounded in a legal determination of the defendant's claim of qualified immunity, appellate jurisdiction over the ruling is appropriate because such a plea can "spare an official not only from liability but from trial." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) (citing *Mitchell*, 472 U.S. at 525–26). "Instant appeal is not available … when the district court determines that factual issues genuinely in dispute preclude summary adjudication." *Id.* (citing *Johnson v. Jones*, 515 U.S. 304 (1995)). Thus, we have jurisdiction pursuant to 28 U.S.C. § 1291 over this appeal only insofar as we may review the district court's determination that genuine issues of fact preclude the resolution of McClone's qualified immunity defense; if we were to find no such factual issues, we would also be entitled to review the denial itself.

## III

When public officers violate the constitutional rights of citizens, section 1983 provides the vehicle for a legal claim.

One possible affirmative defense, however, is qualified immunity. This is a doctrine that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). We recently explained that qualified immunity strikes a balance between "protect[ing] a government official's ability to function without the threat of distraction and liability" and "afford[ing] members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Gibbs*, 755 F.3d at 537 (quotation marks and citations omitted).

In evaluating McClone's qualified immunity defense, we must answer two questions: first, whether the facts, taken in the light most favorable to Jerome, depict a violation of a constitutional right, and second, whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). McClone urges that the answer to both questions is "No." He argues that he did not violate Jerome's Fourth Amendment freedom from unreasonable seizures. Second, even if he did violate Jerome's right, McClone contends that, focusing on the correct level of generality, the right was not clearly established. "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs*, 755 F.3d at 537.

A

Police officers are entitled in appropriate circumstances to use force, up to and including deadly force. But it is also the case that the Constitution forbids the use of excessive

force. The question whether a particular use of force has crossed the constitutional line is governed by the Fourth Amendment, which prohibits unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court must engage in "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks and citation omitted). In doing so, it should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). In other words, a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force.

As applied to the present case, this means that Jerome has a constitutional right not to be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime. McClone acknowledges this rule, but he responds that he did not violate Jerome's right to be free from unjustified deadly force because McClone had an objectively reasonable belief that he (McClone) was in imminent danger. Given the facts of this case, that is the only theory McClone could advance. Jerome was alone in an enclosed garage. His wife had locked herself in the house, and his son was miles away. It is true that Jerome had a prior felony conviction and thus he was violating 18 U.S.C. § 922(g) by possessing a firearm. Nonetheless, taking the facts as Jerome recounts them, Jerome did nothing to suggest that he

would resist arrest. See *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.") (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)).

We recognize that our analysis of the objective reasonableness of McClone's actions must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and that we must "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham*, 490 U.S. at 396–97). "What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed*, 316 F.3d at 683 (citation omitted).

So what did McClone know? He knew four things: 1) Jerome had access to a firearm and maybe ammunition; 2) someone had called 911 saying that Jerome was suicidal; 3) Jerome did not want to talk to the dispatcher and had not responded to McClone's knocks; and 4) there were sounds from inside the garage that sounded like pattering on cupboard doors. In addition, Jerome had hung up on the dispatcher and told her to tell the officer to leave the premises. (The parties do dispute *why* Jerome did not respond to McClone's knocks on the garage: Jerome says that he did not

hear any outside noises until McClone kicked down the door, and McClone feared imminent violence.)

These facts fall short of suggesting anything more than that Jerome was putting himself in imminent danger. Neither Susan nor Jerome told the dispatcher that Jerome was going to harm the responding officer nor did Jerome say anything to McClone when the officer arrived and knocked. *Cf. DeLuna v. City of Rockford*, 447 F.3d 1008, 1011–12 (7th Cir. 2006) (an officer's use of deadly force was reasonable when suspect said "I've got something for you. You are going to have to kill me," and refused to raise his hands or stop walking toward the officer).

Taking another perspective, McClone also argues that he was entering what he calls a "fatal funnel," an enclosed space through a single entrance. A reasonable officer, he continues, would see this as an inherently dangerous encounter. But McClone does not explain why a reasonable officer would believe that he was in imminent danger simply because he was entering an enclosed garage with a single entrance. Essentially, this argument proves too much. If we were to adopt it, we would be saying that officers are entitled, when responding to a suicide call, to use deadly force any time they forcibly enter a single-entrance room. We are aware of no ruling that permits this sort of shoot-on-sight response to this class of encounters.

McClone also insists that it is undisputed that he believed his life was in danger because of the way Jerome was holding the gun. The critical problem with that argument, as the district court recognized, is that the way in which Jerome was holding the gun *is* disputed. Our task is to determine, under Jerome's version of the facts, if McClone was objec-

tively reasonable in his belief that his life was in danger. At the moment McClone kicked down the door and saw Jerome, McClone only knew the four relevant facts we reviewed earlier. Those facts are not enough to justify the instant use of deadly force. It does not matter for purposes of the Fourth Amendment that McClone subjectively believed that his life was in danger. The test is an objective one, and taking the facts as Jerome presents them, it is not met.

As the district judge rightly noted, if Jerome had the gun raised to his shoulder and pointed at McClone, then McClone would have been justified in using deadly force and hence entitled to qualified immunity. See *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003). That alternate set of facts would have made McClone's assessment of the situation objectively reasonable. But, to repeat, the facts are disputed, and that is why the district judge was correct to determine that for present purposes Jerome has alleged actions that violated his Fourth Amendment right against unreasonable seizures.

B

We now turn to whether the right Jerome is asserting was clearly established at the time of the events. "To be 'clearly established,' the right in question must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In excessive force cases, "in addition to the deference of-
ficers receive on the underlying constitutional claim, quali-
fied immunity can apply in the event the mistaken belief
was reasonable." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). In
essence, McClone enjoys a kind of double deference: "the
substantive constitutional standard protects [his] reasonable
factual mistakes" and "qualified immunity protects [him]
from liability where [he] reasonably misjudge[d] the legal
standard." *Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th
Cir. 2009). Jerome has the burden of either identifying a
"closely analogous case that established a right to be free
from the type of force the police officers used on him" or of
showing "that the force was so plainly excessive that, as an
objective matter, the police officers would have been on no-
tice that they were violating the Fourth Amendment."
*Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quota-
tion marks and citation omitted).

Under the first approach, Jerome must "produce a case
clearly establishing the right in a particularized sense, rather
than in an abstract or general sense." *Id.* at 900 (quotation
marks and citation omitted). "Existing precedent must have
placed the statutory or constitutional question beyond de-
bate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). The Su-
preme Court has "'repeatedly told courts … not to define
clearly established law at a high level of generality,' since
doing so avoids the crucial question whether the official act-
ed reasonably in the particular circumstances that he or she
faced." *Plumhoff*, 134 S. Ct. at 2024 (quoting *al-Kidd*, 131 S. Ct.
at 2084).

Jerome relies on two Supreme Court cases, *Graham v.
Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S.

1 (1985), and a handful of decisions from our sister circuits. *Graham* and *Garner* stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else. The court of appeals cases are even more specific: they say that officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers. See, *e.g.*, *Mercado v. City of Orlando*, 407 F.3d 1152, 1157–58 (11th Cir. 2005) ("All of the factors articulated in *Graham* weigh in favor of Mercado. Because he was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head, if Padilla aimed for Mercado's head, he used excessive force when apprehending Mercado."); *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991) (concluding in a § 1983 excessive-force case that the two versions of a police shooting presented a classic factual dispute and that the reasonableness of the shooting was a jury question).

McClone argues that there is no rule flatly forbidding the use of deadly force even if a weapon is not directly pointed at an officer. But the cases on which he relies are different from this one: they involve suspects who threatened the officer in some way. See, *e.g.*, *Henning v. O'Leary*, 477 F.3d 492, 495–96 (7th Cir. 2007) (concluding deadly force was reasonable where suspect resisted arrest); *DeLuna*, 447 F.3d at 1011–12. As our account of Jerome's version of the facts demonstrates, there is no evidence that Jerome threatened McClone and so that theory cannot help McClone.

Even if we were to conclude that no other decisions are sufficiently analogous to be pertinent, we would still be unable to uphold a finding of qualified immunity on this rec-

ord. McClone's shooting of Jerome while Jerome was passively sitting in a chair with the gun across his lap would meet the alternative standard of plainly excessive conduct. Recall that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 131 S. Ct. at 2085 (quotation marks and citation omitted). Kicking down a door and immediately shooting a suicidal person who is neither resisting arrest nor threatening anyone save himself is an excessive use of force. And each of the four shots inflicted injury on Jerome. McClone did not look through the other windows into the garage to see what Jerome was doing, nor did he try to talk to him. Instead, within three minutes of arriving at the scene, McClone opened fire. Either viewed as so plainly excessive that no analogous case is needed, or viewed in light of existing authority, this was an excessive use of force.

## IV

The existence of a factual dispute about the circumstances surrounding McClone's decision to fire on Jerome precludes a ruling on qualified immunity at this point. The district court correctly recognized this, and thus its judgment is AFFIRMED.