**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1353**

RAINA CONNOR, Administratrix of the Estate of Adam Wade Carter,

Plaintiff - Appellee,

v.

TAVARES THOMPSON, in his official and individual capacities; WAKE COUNTY SHERIFF DONNIE HARRISON, in his official and individual capacities; THE OHIO CASUALTY INSURANCE COMPANY,

Defendants – Appellants,

and

XYZ CORPORATION, in its capacity as Surety on the official bond of the Sheriff of Wake County; JOHN AND JANE DOES 1-10, individually and in their official capacities as Deputy Sheriffs of Wake County; WAKE COUNTY; ASHLEY STEINBERGER; KELLY MITCHELL,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Malcolm J. Howard, Senior District Judge. (5:12-cv-00701-H)

Argued: January 26, 2016                    Decided: May 2, 2016

Before AGEE and THACKER, Circuit Judges, and Henry E. HUDSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part and dismissed in part by unpublished per curiam opinion.

———————————

**ARGUED:** James Nicholas Ellis, POYNER SPRUILL LLP, Raleigh, North Carolina, for Appellants.  Huntington MacCallum Willis, MARTIN & JONES, PLLC, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Caroline P. Mackie, POYNER SPRUILL LLP, Raleigh, North Carolina; Roger A. Askew, Jennifer McGuire Jones, WAKE COUNTY ATTORNEY'S OFFICE, Raleigh, North Carolina, for Appellants.  Hoyt G. Tessener, G. Christopher Olson, MARTIN & JONES, PLLC, Raleigh, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Todd McElfresh called 911 to request help transporting his nephew, Adam Carter, to a local psychiatric hospital because Carter was threatening to kill himself. Tavares Thompson, a Wake County, North Carolina, Sheriff's Deputy, was the first to respond. When Thompson encountered Carter, the latter was holding what appeared to be a paring knife. Thompson, upon seeing the knife, instructed Carter to drop it. When Carter failed to comply, Thompson fired his gun twice. Both shots struck Carter, resulting in his death.

Raina Connor,[1] acting as the administratrix of Carter's estate, ("Appellee") subsequently sued Thompson, along with Wake County Sheriff Donnie Harrison and the Ohio Casualty Insurance Company (collectively, "Appellants").[2] Appellee's complaint alleges, inter alia, that Thompson's actions constitute excessive force and assault and battery, and that the Wake County Sheriff failed to provide adequate training and

_____

[1] Appellee's name is spelled "Conner" in the third amended complaint below, and that spelling has been used by the parties in numerous documents submitted to both the district court and this court. But her name appears as "Connor" in the initial complaint and on the district court's and this court's dockets. It is unclear which version of Appellee's name is a misspelling, so we use the spelling consistent with the docketing notice that initiated this appeal.

[2] The complaint also names a number of additional defendants who do not join in this appeal.

3

supervision to its employees and is liable for Carter's death pursuant to Monell v. New York City Department of Social Services, 436 U.S. 658 (1978). The district court denied Appellants' motion for summary judgment on each of these claims, and Appellants filed this appeal in response. We affirm in part and dismiss in part.

I.

A.

On February 11, 2012, Adam Carter was living with his uncle, Todd McElfresh, in Raleigh, North Carolina, along with a third roommate, Tom Boykin. When McElfresh and Boykin woke that morning, they found Carter drunk and suicidal. Carter, who struggled with alcoholism, indicated that he was willing to speak to a doctor. Carter told his uncle that he "need[ed] . . . help," J.A. 574,[3] and later asked McElfresh to "[c]all Holly Hill," id. at 586, which is a psychiatric hospital in Raleigh. McElfresh made the call, but nobody answered.

McElfresh then called a friend, who, after listening to an explanation of Carter's situation, advised McElfresh to call 911. McElfresh did get an answer there, and after

_____

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

emergency responders were en route, the dispatcher stayed on the line and tried to talk Carter out of attempting suicide.

The efforts were not entirely successful. After speaking to the dispatcher for a few minutes, Carter handed the phone back to McElfresh, and walked to the kitchen. He retrieved a paring knife and attempted, unsuccessfully, to cut his wrist while Boykin tried to talk him out of it.

Deputy Thompson arrived shortly thereafter. He met McElfresh outside the house and followed him into an entrance foyer. McElfresh then proceeded alone up a four-step stairwell leading to the living room where Carter was waiting. McElfresh told Carter that his ride had arrived, and both men started downstairs toward the foyer. Carter was still holding the paring knife he had used to try to cut his wrist.

Thompson saw the knife when Carter was about halfway down the four stairs. He drew his gun and told Carter to drop the knife. The command was repeated several times, by Thompson as well as McElfresh and Boykin, but Carter did not comply. When Carter reached the bottom of the stairs, Thompson fired twice, killing him.

### B.

Aside from this general description, the parties dispute what exactly happened between the time Thompson saw the knife and the time he fired his weapon. The district court

5

properly recognized that, at the summary judgment stage, all disputes of material fact must be resolved in favor of Appellee, the non-moving party. Given the posture of this appeal, we must accept,[4] and therefore incorporate, the district court's characterization of the disputed facts:

> [T]he details of the brief time (mere second[s] to minutes) between Deputy Thompson entering the residence and the firing of his weapon[] are disputed. . . . Chief among the disputes are (1) exactly where Deputy Thompson was standing in relation to the front door (whether back against a wall or directly in front of the door); (2) the position of the knife during Carter's descent on the stairs (whether he changed hands, raised the knife, etc.); and, (3) Carter's speed and agility in descending the stairs (whether falling down drunk or lunging at the deputy). However, viewing the evidence in the light most favorable to the non-moving party, here the plaintiff, the court notes the following evidence: Thompson testified that he saw Carter with the knife in his hand while Carter was on the second step and while Thompson had just crossed the threshold of the front door. The front door remained opened at all times. The knife Carter had in his hand was a small paring knife. Carter slowly staggered down two steps while holding on to the wall to support himself. McElfresh testified that Carter never rushed toward Thompson or made any aggressive moves or steps.

Conner ex rel. Carter v. Wake Cty., No. 5:12-cv-701, 2015 WL 1125065, at *2 (E.D.N.C. Mar. 12, 2015).

---

[4] See infra Part III.A.

6

Based on the foregoing, Appellee sued Appellants, on October 25, 2012, in the United States District Court for the Eastern District of North Carolina. Appellee's Third Amended Complaint asserts in relevant part causes of action for excessive force, inadequate training and supervision, and Monell liability pursuant to 42 U.S.C. § 1983, as well as assault and battery pursuant to North Carolina state law.

On May 30, 2014, Appellants moved for summary judgment. The district court denied the motion with respect to each claim at issue in this appeal. It found "substantial fact questions in dispute which preclude the entry of summary judgment as to the excessive force claim." Conner, 2015 WL 1125065, at *3. It further reasoned, "[a]s summary judgment on the excessive force claim is precluded because of disputed facts, so also is a decision on qualified immunity at this stage of the litigation," id., and the court went on to deny summary judgment on the Monell liability, inadequate training and supervision, and assault and battery claims as well. Appellants timely appealed.

## II.

"We review de novo a district court's decision to deny a summary judgment motion asserting qualified immunity. Summary judgment is appropriate 'if the movant shows that there is no

7

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (citation omitted) (quoting Fed. R. Civ. P. 56(a)). "In reviewing [a] district court's decision denying qualified immunity, we generally accept the facts as the court viewed them." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014).

### III.

### A.

"[W]e first satisfy ourselves of our jurisdiction" before proceeding to decide this case. Cooper v. Sheehan, 735 F.3d 153, 157 (4th Cir. 2013). Appellee has argued that we are without jurisdiction because this appeal turns solely on disputes of fact. We disagree with that characterization.

"[D]enial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 . . . ." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). On the other hand, a "District Court's determination that the summary judgment record . . . raised a genuine issue of fact . . . [i]s not a final decision." Johnson v. Jones, 515 U.S. 304, 313 (1995) (internal quotation marks omitted). In combination, these two rules allow us to review the legal conclusions underlying a district court's denial of qualified immunity in an

8

interlocutory appeal but do not permit us to reconsider any "determin[ation] . . . of . . . which facts a party may, or may not, be able to prove at trial." Id. "In other words, . . . we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them." Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

For this reason, we do not consider Appellants' assertions that Carter had his knife extended in a thrusting position or that Deputy Thompson had his back to a wall at the time of the shooting. The district court identified both issues as disputed, writing, "Chief among the [factual] disputes are (1) exactly where Deputy Thompson was standing in relation to the [open] front door . . . [and] (2) the position of the knife during Carter's descent on the stairs." Conner ex rel. Carter v. Wake Cty., No. 5:12-cv-701, 2015 WL 1125065, at *2 (E.D.N.C. Mar. 12, 2015). The district court's articulation of these disputes in the light most favorable to the Appellee -- that Carter never raised the knife or "made any aggressive moves" and that "Thompson had just crossed the threshold of the front door[,] [which] remained opened at all times," id. -- binds us.

Nonetheless, the appeal need not be dismissed outright. The crux of Appellants' argument is the legal contention that Thompson is entitled to qualified immunity on

9

any view of the factual record -- including the view adopted by the district court.  Resolving that contention is within our jurisdiction, and occasional reference to alternative views of the facts does not strip the jurisdictionally appropriate claim from the case.  See Cooper, 735 F.3d at 158 ("Although the Officers mention evidence that they believe will ultimately disprove Cooper's version of the facts, for purposes of this appeal they have accepted the facts as viewed by the district court.  Proceeding from that foundation, the Officers make the legal argument that they did not contravene Cooper's constitutional rights.  In these circumstances, we are satisfied of our jurisdiction under the collateral order doctrine . . . .").

Accordingly, we proceed to resolve the question of whether the facts, as viewed by the district court, entitle Thompson to qualified immunity.  After doing so, we will address whether our jurisdiction extends to the remaining issues on appeal.

B.

We turn, then, to Appellants' primary contention -- that Thompson is entitled to qualified immunity from the excessive force claim raised in this case.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly

established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). A "qualified immunity analysis," therefore, "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015). We consider each inquiry in turn, beginning with the question whether Appellee could establish before a trier of fact that Thompson used unconstitutionally excessive force when he shot Carter.

1.

A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). Consequently, we evaluate the facts "from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided. Additionally, the reasonableness of the officer's actions . . . [must be] determined based on the information possessed by the officer at the moment that force is employed." Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005) (citations omitted).

11

The objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (quoting Graham, 490 U.S. at 396). To perform this balancing, we look to "the facts and circumstances of each particular case," with an eye toward three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In this case, Thompson deployed deadly force, which requires that a particular governmental interest be at stake to satisfy our balancing test. Because "[t]he intrusiveness of . . . deadly force is unmatched," it may only be used when an "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3, 9 (1985).

Our task, then, is to determine whether the facts and circumstances found by the district court establish this requisite probable cause. We hold that they do not.

The first and third Graham factors plainly favor Appellee here. Neither provides a basis on which a reasonable

12

officer could conclude that Carter posed a threat of death or serious injury to others.

As to the first factor, Carter had committed no crime known to Thompson. His uncle called 911 because Carter was suicidal and needed help. "When the subject of a seizure 'ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 899 (4th Cir. 2015) (quoting Bailey v. Kennedy, 349 F.3d 731, 743-44 (4th Cir. 2003)).

As to the third factor, nothing in the district court's view of the facts supports a conclusion that Carter intended to flee, nor was he actively resisting arrest. Viewed in the light most favorable to Appellee, the evidence would show that Carter slowly staggered down the steps in the general direction of the Deputy after his uncle said to follow him because Carter's ride to Holly Hill had arrived. Such behavior imparts no indication that would create a governmental interest in inflicting deadly force. See Smith, 781 F.3d at 102-03 (Where an arrestee "did not strike at [the arresting officer], attempt to flee the scene, or even turn her back to him," the third Graham factor did not authorize use of force.).

Here, the parties' arguments center on whether the second factor nonetheless favored the use of force, namely, whether Carter's actions are reasonably believed to have

13

constituted an immediate threat to Thompson or another person. Viewing the record in the light most favorable to Appellee, Carter possessed a paring knife, refused to comply with repeated commands to drop the weapon, and continued down the stairs (and thus closer to Thompson) rather than stopping. As for the knife, we have held "the mere possession of a [deadly weapon] by a suspect is not enough to permit the use of deadly force. . . . Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon." Cooper, 735 F.3d at 159 (emphasis in original).[5] And while Carter stubbornly maintained possession of his knife, the assumed circumstances Thompson confronted do not establish that Carter threatened anyone with it.

For the present inquiry, the district court appropriately assumed that Carter never raised his knife, changed hands, or acted aggressively with it. We have held that holding a weapon in a non-threatening position while "ma[king] no sudden moves[] . . . fail[s] to support the proposition that a reasonable officer would have had probable cause to feel

---

[5] See also Pena v. Porter, 316 F. App'x 303, 312 (4th Cir. 2009) ("Absent any additional factors which would give the Officers probable cause to fear for their safety or for the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force.").

threatened." Cooper, 735 F.3d at 159. Thompson, moreover, had been informed that Carter was suicidal, which could have explained the reason for holding the knife. See id. at 160 (concluding that where police officers failed to identify themselves and had created a "nocturnal disturbance" on the plaintiff's property, the plaintiff's "rationale for bearing a firearm while investigating [that] disturbance . . . 'should have been apparent to [the Officers] at the time of the shooting.'" (quoting Pena v. Porter, 316 F. App'x 303, 312 (4th Cir. 2009))).

The district court also assumed that Carter was "slowly stagger[ing] . . . while holding on to the wall to support himself." Conner, 2015 WL 1125065, at *2. Evidence that an individual can barely walk contravenes a police officer's argument that deadly force was necessitated by the risk that the individual might charge and attack the officer. See Clem v. Corbeau, 284 F.3d 543, 552 (4th Cir. 2002).

Viewing the district court's assumed facts in totality, we fail to see how they would give a reasonable officer "probable cause to believe that [Carter] pose[d] a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3. Those assumed facts depict a non-aggressive, partially incapacitated, non-criminal holding a knife in his own residence while providing no

15

indication that the knife was about to be used to harm someone else.[6]  Using deadly force against such an individual is unconstitutional, and the district court, therefore, did not err by denying Appellants' motion for summary judgment on the question whether Thompson's actions violated Carter's constitutional rights.

2.

We turn, then, to the second inquiry in our qualified immunity analysis: Was this constitutional violation clearly established when it occurred?

Even when state officials violate the Constitution, "[t]he doctrine of qualified immunity shields [the] officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).  A right is sufficiently clearly established to expose an official to

---

[6] If this case proceeds to trial, the trier of fact would not be bound to accept this set of assumed facts as we are. Accordingly, our conclusion that Thompson's use of force was objectively unreasonable and our underlying reasoning -- both of which are expressly based on a set of facts that the ultimate trier of fact need not accept -- likewise do not bind that trier of fact on remand. See, e.g., Clem, 284 F.3d at 552 ("Of course, [the plaintiff] ultimately may not be able to prove these facts, but, if he can, . . . [the defendant officer] violated [the plaintiff]'s Fourth Amendment right to be free from excessive police force.")

liability if "every reasonable official would have understood that what he is doing violates that right." Id. (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted). We evaluate whether the unlawfulness of a particular violation was apparent "in light of the specific context of the case, not as a broad general proposition." Mullenix, 136 S. Ct. at 308 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

In this case, Thompson confronted a suicidal and obviously impaired but non-aggressive man who refused to drop a knife held in a non-threatening manner while "slowly stagger[ing]" down stairs. Conner, 2015 WL 1125065, at *2. The front door remained open behind Thompson at all times. We think the unconstitutionality of using deadly force in that specific context was apparent.

Three decades ago, the Supreme Court set forth the requirement that police officers limit deadly force to situations where "probable cause to believe that the suspect poses a significant threat of death or serious physical injury

17

to the officer or others" exists.  $\underline{Garner}$, 471 U.S. at 3.  And we have since held that officers who commit a violation "manifestly included within" the "core constitutional principle" announced in $\underline{Garner}$ are not entitled to qualified immunity. $\underline{Clem}$, 284 F.3d at 553 (quoting $\underline{Buonocore\ v.\ Harris}$, 65 F.3d 347, 357 (4th Cir. 1995)).

Thompson's violation fits within that principle.  No reasonable officer could think that a suicidal, non-criminal individual holding a small paring knife and otherwise acting in a nonthreatening manner who had difficulty standing and walking presents justification to deviate from $\underline{Garner}$'s bright-line proscription.  $\underline{Garner}$, therefore, constitutes sufficient notice to bar qualified immunity in this case.  See $\underline{Weinmann\ v.}$ $\underline{McClone}$, 787 F.3d 444, 451 (7th Cir. 2015) (holding that $\underline{Garner}$ (and $\underline{Graham}$) provided adequate clearly established law to guide an officer's conduct when he encountered an armed suicidal person "who is neither resisting arrest nor threatening anyone save himself" even where no circuit precedent was more directly analogous); $\underline{Mercado\ v.\ City\ of\ Orlando}$, 407 F.3d 1152, 1160 (11th Cir. 2005) (Where officers found a suicidal individual "crying on the floor of his kitchen with a loose cord around his neck and a kitchen knife placed up to, but not poking into, his chest," the decision to use deadly force was "'so far beyond the hazy border between excessive and acceptable force that the

18

official had to know he was violating the Constitution [based on Garner and other broadly stated excessive force articulations] even without caselaw on point.'" (alterations omitted) (quoting Willingham v. Loughnan, 321 F.3d 1299, 1303 (11th Cir. 2003)).

There is also existing Fourth Circuit precedent concerning the use of force against an armed, but non-threatening individual. Most specifically, we held that officers who acted in 2007 were not entitled to qualified immunity after deploying deadly force against an individual who "stood at the threshold of his home, holding [a] shotgun in one hand," but otherwise doing nothing "to support the proposition that a reasonable officer would have had probable cause to feel threatened." Cooper, 735 F.3d at 159; see id. at 160. Accepting Appellee's version of events, Thompson, acting in 2012, had no less notice that deadly force was clearly unlawful when he fired as Carter descended two steps inside his home, refused to drop a paring knife, but otherwise did nothing to support the conclusion that he posed an immediate threat to anyone's safety.

As the district court recognized, then, summary judgment in Thompson's favor is precluded at both steps of the qualified immunity analysis. The facts, as we must view them for purposes of summary judgment, would be sufficient to support a trier of fact's finding that shooting Carter amounted to

19

excessive force.  Moreover, a reasonable officer would know that shooting Carter under the circumstances presented by Appellee's version of the facts would be unlawful.

C.

Appellants challenge the district court's summary judgment decision on two other fronts.  They assert the decision erroneously withheld summary judgment on the remaining § 1983 claims and further argue North Carolina's doctrine of public officers' immunity precludes the pending assault and battery claim.  However, our conclusion that Thompson is not entitled to qualified immunity at this stage of the litigation forecloses both objections.

1.

Appellants argue they are entitled to summary judgment on the constitutional claims lodged against the Wake County Sheriff -- an inadequate training and supervision claim and a claim brought pursuant to Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).[7]  Having declined to award qualified immunity to Thompson, however, we lack jurisdiction to consider these claims.

---

[7] For simplicity's sake, we will refer to these two claims collectively as "supervisory claims" throughout the remainder of this opinion.  The jurisdictional analysis that follows is the same for each claim.

20

Generally, "[a]n erroneous ruling on [supervisory] liability may be reviewed effectively on appeal from final judgment." Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 43 (1995). Accordingly, the denial of Appellants' motion for summary judgment with respect to the claims against the Wake County Sheriff "[i]s not an appealable collateral order." Id.; see also Evans v. Chalmers, 703 F.3d 636, 654 n.11 (4th Cir. 2012) ("We recognize that because cities do not possess qualified immunity from § 1983 claims, we do not have appellate jurisdiction under the collateral order doctrine to hear the City's appeal of the Monell claims." (citation omitted)).

Appellants are nevertheless correct that we have pendent jurisdiction to review such a denial in certain interlocutory appeals. Where "our determinations of . . . individual officers' qualified immunities fully resolve the issue of . . . [supervisory] liability, we [may] exercise pendent appellate jurisdiction over [such] claims." Evans, 703 F.3d at 654 n.11; see also Altman v. City of High Point, 330 F.3d 194, 207 n.10 (4th Cir. 2003). "[F]ull[] resol[ution]" is achieved when a qualified immunity analysis results in the conclusion that no individual officer committed a constitutional violation. Evans, 703 F.3d at 654. Since supervisory "claims require a predicate constitutional violation to proceed,"

21

foreclosure of the individual predicate violation necessitates dismissal of the supervisory claims.  Id.

But the full resolution requirement is not met here, where we concluded that Appellee has articulated a version of events that would allow the trier of fact to conclude that Thompson used excessive force.  When a predicate constitutional violation in fact occurs, affirmatively establishing individual and supervisory liability requires distinct showings.  See City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (listing the elements necessary to establish a constitutional violation pursuant to a supervisory liability theory).  And there is no sense in which confirming the existence of a claim's prerequisite can be understood as "fully resolv[ing] the claim[]."  Altman, 330 F.3d at 207 n.10.  "[I]n the face of a constitutional violation," therefore, "we lack subject-matter jurisdiction to entertain an appeal of [supervisory] claim[s]" at an interlocutory stage. Martin v. City of Broadview Heights, 712 F.3d 951, 963 (6th Cir. 2013).

Appellants' request that we reverse the district court's judgment with respect to the pending supervisory claims is, accordingly, dismissed for lack of jurisdiction.

22

We do have jurisdiction to consider Appellants' final challenge -- whether the district court erred by denying their motion for summary judgment with respect to the state law assault and battery claim. Dismissal of that claim is required by North Carolina's doctrine of public officers' immunity, Appellants argue, because the summary judgment record is devoid of evidence that Thompson acted maliciously, corruptly, or outside the scope of his authority. "[W]e have jurisdiction over [a] police officer['s] appeal of the district court's denial of public officers' immunity" in an interlocutory appeal "[b]ecause, under North Carolina law, public officers' immunity is an immunity from suit." Bailey v. Kennedy, 349 F.3d 731, 738-39 (4th Cir. 2003) (applying North Carolina law).

But "public officers' immunity . . . is unavailable to officers who violate clearly established rights." Bailey, 349 F.3d at 742. So in cases where "a jury could find that no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time[,] [a] parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well." Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994) (applying North Carolina law) (citation omitted).

That holding controls this case. Our denial of summary judgment on Thompson's qualified immunity defense necessarily entails our judgment that, on the required view of the facts, no reasonable officer could have believed Thompson's conduct was lawful. The state law assault and battery claim based on the same conduct is thus "subsumed within the federal excessive force claim," Rowland, 41 F.3d at 174, and suffers its same fate. We affirm the district court's conclusion that summary judgment is not appropriate.

IV.

For the foregoing reasons, the judgment of the district court is affirmed with respect to the excessive force and assault and battery claims. Appellants' appeal of the district court's determination of the supervisory claims is dismissed for want of jurisdiction.

AFFIRMED IN PART
AND DISMISSED IN PART

24