In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 18-1514

CRAIG STRAND,

*Plaintiff-Appellee,*

*v.*

CURTIS MINCHUK,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:15-cv-149 — **James T. Moody**, *Judge.*

———————————

ARGUED AUGUST 7, 2018 — DECIDED NOVEMBER 8, 2018
AS AMENDED ON PETITION FOR REHEARING DECEMBER 6, 2018

———————————

Before KANNE, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* We consider whether the district court erred at summary judgment in denying qualified immunity to a police officer who, in the context of an argument and fist fight over parking tickets, shot a semi-truck driver. The officer fired the shot after the driver stopped fighting, stepped back from the officer, and—with his hands in the air—twice said "I surrender." The district court concluded

that a material question of fact existed as to whether the driver continued to pose a threat at the exact moment the officer fired the shot.

We affirm. We cannot read the facts in the light most favorable to the plaintiff and, on the record as it presently stands, conclude as a matter of law that the officer is entitled to qualified immunity. Doing so would mark a stark departure from clearly established law regarding an officer's use of deadly force. A trial is necessary to determine the precise timeline and circumstances leading to and surrounding the officer's deployment of such force.

## I

### A

Our retelling of the facts tracks the district court's account at summary judgment. See *Estate of Clark v. Walker*, 865 F.3d 544, 547 (7th Cir. 2017).

Craig Strand drives an 18-wheeler. On May 20, 2013, he stopped in Merrillville, Indiana, to take a mandatory drug screening test. Unable to find parking at the drug-testing facility, Strand received permission to park his rig outside a nearby Planned Parenthood office.

Curtis Minchuk, a police officer with the Town of Merrillville, was working security at Planned Parenthood the same day. He did so in uniform with authorization from the Town. Upon reporting to work, Minchuk noticed a semi-truck parked in the lot. Unable to find the driver, he wrote two parking tickets and left them on the truck's windshield.

Upon returning to his truck, Strand found the tickets and went into Planned Parenthood to ask about them. An

employee directed Strand to meet a police officer by his truck. Strand tried to discuss the tickets with Officer Minchuk, explaining that he did not see any no-parking signs in the lot, and also had received permission to park there. Minchuk had no interest in discussing the tickets beyond, as the district court observed, allegedly soliciting a bribe from Strand. After Strand declined to pay, Minchuk drove to the back of the Planned Parenthood facility.

Strand started his rig, but before driving away used his cell phone to take pictures of the parking lot, thinking he might need them to show the absence of no-parking signs to contest the tickets. Observing from a distance, Officer Minchuk returned to the truck and ordered Strand to leave immediately. Strand said he would leave as soon as he finished taking pictures. Minchuk responded by saying he was calling a tow truck and telling Strand he had two minutes to leave.

The situation then escalated. Stepping toward Strand, Officer Minchuk admonished, "I told you to get the f*** outta here," and slapped Strand's cell phone to the ground. Minchuk then demanded Strand's identification; Strand refused and countered by demanding Minchuk's badge number. Minchuk replied, "I said, give me your I.D." and grabbed Strand by his shirt and neck, resulting in Strand's shirt tearing off his body. Minchuk attempted to push and tackle Strand to the ground, with Strand resisting by holding on to Minchuk's arm.

At that point, both men fell to the ground, with Strand then punching Minchuk at least three times in the face and placing his hands on Minchuk's throat. Minchuk testified that this caused him to see stars, to feel as if he would pass out,

and to fear for his life. He worried that, if he passed out, Strand would take his gun and shoot him.

The fist fight ceased when Strand stood up, backed four to six feet away from Officer Minchuk, put his hands up, and said, "I surrender. Do whatever you think you need to do. I surrender, I'm done." While still on the ground, Minchuk responded by removing his gun from its holster and firing a shot at Strand, striking him in the abdomen. Strand survived the gunshot wound. (In a subsequent proceeding in Indiana state court, Strand was convicted of committing felony battery of a police officer.)

B

Strand brought suit under 42 U.S.C. § 1983 against Officer Minchuk and the Town of Merrillville for the use of excessive force in violation of the Fourth Amendment. The defendants moved for summary judgment, contending that undisputed facts showed that Officer Minchuk could have reasonably believed Strand was not subdued—and therefore continued to present a danger—at the moment Minchuk chose to use deadly force. The defendants further argued that regardless of the district court's ruling on the merits of the excessive force claim, Minchuk was entitled to qualified immunity.

The district court denied the Town and Minchuk's motion for summary judgment, concluding that a material fact remains unresolved and contested between the parties: whether sufficient time passed upon Strand's surrender to result in Strand being "subdued prior to Officer Minchuk's use of deadly force." Putting the same point another way, the district court determined that Strand's substantive Fourth Amendment claim and Officer Minchuk's corresponding

request for qualified immunity could not be resolved on summary judgment because the record leaves "unclear whether the rapidly-evolving nature of the altercation justified Officer Minchuk's use of force, or whether he had time to recalibrate the degree of force necessary, in light of plaintiff's statement of surrender."

In emphasizing that these questions could not be answered on summary judgment, the district court was able to make the limited observation that, "[a]t some point at the start of the physical altercation Officer Minchuk called for assistance over his radio." The court further observed that twenty-one seconds passed from Minchuk's radio call for backup to the report of the shooting, which the record shows came from a Planned Parenthood employee who called 911.

Officer Minchuk now appeals, urging us to reverse the district court's denial of qualified immunity.

## II

### A

We begin, as we must, by evaluating our jurisdiction over Officer Minchuk's appeal. Although the denial of summary judgment ordinarily does not constitute an appealable final order under 28 U.S.C. § 1291, the collateral-order doctrine affords an exception for a denial of qualified immunity. See *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Thompson v. Cope*, 900 F.3d 414, 419 (7th Cir. 2018).

The Supreme Court's decision in *Johnson v. Jones*, 515 U.S. 304 (1995) teaches that the exception is not absolute, however. Immediate appeal is available only if we can evaluate the denial of qualified immunity as a legal matter. See *id.* at 319–20. Here that requires us to view the facts as the district court did

in ruling on Officer Minchuk's motion for summary judgment—in the light most favorable to Strand as the plaintiff and non-moving party. See *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). Only then do we evaluate the constitutionality of Officer Minchuk's conduct. See *Thompson*, 900 F.3d at 419–20; *Jones*, 630 F.3d at 680–81.

In answering whether a police officer is entitled to qualified immunity as a matter of law, we must avoid resolving contested factual matters. See *Gutierrez v. Kermon*, 722 F.3d 1003, 1011 (7th Cir. 2013); *Weinmann v. McClone*, 787 F.3d 444, 446 (7th Cir. 2015) ("An appeal from a ruling on qualified immunity is not the time for the resolution of disputed facts."). If we detect a "back-door effort" to contest facts on appeal, we lack jurisdiction. *Jones*, 630 F.3d at 680; see also *Gutierrez*, 722 F.3d at 1010 (reiterating limits of appellate jurisdiction over appeal from denial of qualified immunity and stating that a party "effectively pleads himself out of court by interposing disputed factual issues in his argument").

Aware of this jurisdictional limitation, Officer Minchuk emphasizes that he is not contesting any facts and indeed, for purposes of this appeal, accepts them in the light most favorable to Strand as the non-moving party. We take him at his word and proceed to evaluate whether Officer Minchuk is entitled to qualified immunity as a matter of law. See *Jones*, 630 F.3d at 680 ("In a collateral-order appeal like this one, where the defendants say that they accept the plaintiff's version of the facts, we will take them at their word and consider their legal arguments in that light."); *Knox v. Smith*, 342 F.3d 651, 656–57 (7th Cir. 2003) (following the same approach).

In traveling this path, we cannot retreat from our obligation to avoid trying to answer (as a factual matter) the

question the district court emphasized remains unresolved: whether enough time went by between Strand's surrender and Minchuk's use of deadly force such that Strand was subdued at the moment Minchuk fired the shot. The Supreme Court has underscored the necessity for this exact discipline in this exact context—appellate review of a denial of qualified immunity on summary judgment. See *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) ("By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the non-moving party.").

B

In evaluating Officer Minchuk's entitlement to qualified immunity, we undertake the twofold inquiry of asking whether his conduct violated a constitutional right, and whether that right was clearly established at the time of the alleged violation. See *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). We are free to choose which prong to address first. See *Pearson v. Callahan*, 129 S. Ct. 808, 812 (2009).

The first prong of the inquiry, whether Officer Minchuk used excessive force and thereby violated Strand's Fourth Amendment rights, is governed by the Supreme Court's decisions in *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989). The law requires an assessment of the totality of the facts and circumstances and a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." See *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham*, 490 U.S. at 396). At a more specific level, we owe "careful attention" to "the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The proper inquiry is one of "objective" reasonableness that proceeds without regard to the subjective "intent or motivation" of the officer. *Id*. at 397. To be sure, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. So, too, however, have we cautioned that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). After all "[t]he circumstances might materially change," for "[e]ven though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment." See *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018).

If the facts and circumstances show that an individual who once posed a threat has become "subdued and complying with the officer's orders," the officer may not continue to use force. See *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). And that is especially so when it comes to the use of deadly force: "[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448. As the Supreme Court succinctly

stated in *Garner*, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. Wherever "feasible," moreover, the officer should give a warning before deploying deadly force. *Id.* at 12.

For the law to be clearly established—the second prong of the qualified immunity analysis—the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The necessary starting point is to define the right at issue with specificity. See *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). Indeed, the Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances he or she faced." *Rickard*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 563 U.S. at 742); see also *Kisela*, 138 S. Ct. at 1153 (emphasizing importance of defining clearly established law with specificity in the excessive force context).

The demand for specificity is not unyielding or bereft of balance. Assessing whether the law is clearly established does not require locating "a case directly on point." *Kisela*, 138 S. Ct. at 1152. Law enforcement officers, the Court has stressed, "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

C

Whether we approach Officer Minchuk's request for qualified immunity by first assessing the merits of Strand's claim or instead by evaluating whether Minchuk's conduct violated clearly established law, we come to the same barrier: we

cannot—as we must—view the facts in Strand's favor and conclude as a matter of law that Minchuk is entitled to qualified immunity on summary judgment.

Officer Minchuk resorted to the use of deadly force at a time when Strand had stopped fighting, separated from Minchuk, stood up, stepped four to six feet away from Minchuk, and, with his hands in the air, said, "I surrender. Do whatever you think you need to do. I surrender, I'm done." The record shows that Strand was unarmed at all points in time. Furthermore, upon standing, raising his hands, and voicing his surrender, Strand never stepped toward Minchuk, made a threatening statement, or otherwise did anything to suggest he may resume fighting or reach for a weapon.

Recall, too, the broader circumstances that led to the shooting. The police were not in hot pursuit of an individual known to be armed and dangerous. Nor had the police responded to a report of violent crime or otherwise arrived at a location only to find an individual engaged in violent or menacing conduct or acting so unpredictably as to convey a threat to anyone present.

To the contrary, the entire fracas leading to Officer Minchuk's use of deadly force began with his issuance of parking tickets. After Strand declined to make an on-the-spot cash payment and instead sought to take pictures to show the absence of no-parking signs, Officer Minchuk allowed the situation to escalate and boil over by slapping Strand's cell phone to the ground and then tearing Strand's shirt from his body. The fist fight then ensued, with Strand choosing to stop throwing punches and stand up and offer his express surrender, including by raising his hands above his head. It was then—with no direction to Strand to keep his hands in

the air, to fall to his knees, or to lay on the ground—that Officer Minchuk drew his gun and fired the shot.

A reasonable jury could find that Officer Minchuk violated Strand's constitutional right to remain free of excessive force. On these facts and circumstances, considered collectively and in the light most favorable to Strand, Strand no longer posed an immediate danger to Officer Minchuk at the time he fired the shot. The Fourth Amendment does not sanction an officer—without a word of warning—shooting an unarmed offender who is not fleeing, actively resisting, or posing an immediate threat to the officer or the public. See *Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

The district court correctly observed that additional fact finding was necessary to determine whether "the rapidly-evolving nature of the altercation" justified Officer Minchuk's use of deadly force or whether "he had time to recalibrate the degree of force necessary, in light of [Strand's] statement of surrender." This fact finding cannot occur on summary judgment (or appeal), so we cannot conclude that the district court committed error in determining a genuine issue of material fact prevented a resolution of the merits of Strand's claim.

Officer Minchuk urges a contrary conclusion. He argues that Strand's "sudden and unexpected gesture of surrender," after having just finished beating Officer Minchuk about the face and head while pressing down on Officer Minchuk's throat, proves as a matter of law that a reasonable officer could have believed the use of deadly force was objectively warranted to prevent Strand from inflicting additional serious harm. Officer Minchuk goes even further, contending that "[t]here is no dispute in this case that [Strand], who was

standing over Officer Minchuk just a few feet away from him completely unrestrained, was not subdued at the time that Officer Minchuk deployed deadly force."

Factual disputes do not resolve on the force of say so, however. What Officer Minchuk sees as undisputed—whether Strand continued to pose a threat at the moment Minchuk deployed deadly force—is actually unresolved and indeed vigorously contested by Strand. For Minchuk to prevail at this stage, the record must show that he fired while Strand still posed a threat. Instead, the record shows that Strand had backed away, voiced his surrender, and up to five, ten, or fifteen seconds may have elapsed while Strand stood with his hands in the air. And that is why the district court rightly determined, after a close and careful analysis of the record, that Minchuk was not entitled to qualified immunity as a matter of law at summary judgment on the merits of Strand's claim.

This same factual dispute also prevents us from concluding, as Officer Minchuk urges, that Strand's clearly established constitutional rights were not violated, the second prong of the qualified immunity inquiry. We analyze whether precedent squarely governs the facts at issue, mindful that we cannot define clearly established law at too high a level of generality. Yet we can look at the facts only with as much specificity as the summary judgment record allows.

It is beyond debate that a person has a right to be free of deadly force "unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; see also *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) (emphasizing that it is "well-established that police officers cannot continue to use force once a

suspect is subdued"). But the district court could not determine whether—at the point Minchuk used deadly force—Strand posed an imminent harm to Officer Minchuk. The record left unclear precisely how much time went by from the moment the fist fight stopped to the moment Officer Minchuk pulled the trigger.

All the record shows is that twenty-one seconds passed between Officer Minchuk radioing for assistance and the police department receiving the 911 call from the Planned Parenthood employee who reported the shooting. However much time elapsed between the end of the fighting and the gunshot had to be enough for Strand to bring the ground brawl to an end, to stand up and step back four to six feet, and then to raise his arms and say to Officer Minchuk, "I surrender. Do whatever you think you need to do. I surrender, I'm done." Perhaps all of this took ten seconds. Or perhaps it took seven seconds or maybe fifteen. At some point, though, enough time may have passed that it would have been objectively unreasonable for Officer Minchuk to continue to believe that he was in imminent danger. But, as the district court observed, the record at this stage does not answer whether Strand continued to pose a threat when Minchuk fired. And this is the hurdle—the unresolved material question of fact—that Officer Minchuk cannot clear on summary judgment.

Officer Minchuk points to our decision in *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), which he sees as "controlling and dispositive in this case," to contend that there is no way to conclude that he violated clearly established law in using deadly force in the circumstances he faced here. Read fairly, however, *Johnson* lends little support to Officer Minchuk, at least at the summary judgment stage. Facts matter, and the

facts of *Johnson* were quite different. The crimes leading to arrest in *Johnson* were severe—a shooting and then reckless flight in a car and by foot from the police. See 576 F.3d at 660. The suspect had "used every method at his disposal to flee" but encountered a fence "too high for him to jump over." *Id.* At that point, cornered, he put his hands up in the air and attempted to surrender, just as the officer, in a split-second reaction, deployed force on the suspect. *Id.* at 659. Critical to the court's decision that the officer was entitled to qualified immunity was that "it could not have been more than one second between [the suspect's] surrender and the use of force by [the officer]." *Id.* at 660.

The contrast is clear: Strand's confrontation with Officer Minchuk involved no high-speed car and foot chase, no report of a violent crime, and no reason to believe an offender was armed. Far from undermining the clearly established law that the use of deadly force against a person posing no risk of imminent harm is unreasonable, *Johnson* underscores that the circumstances of the surrender and the timeline surrounding the use of force are critical. And here, unlike in *Johnson*, the circumstances are unclear such that we cannot discern with any confidence whether Strand continued to pose a threat to Officer Minchuk.

The clearly established law comes from cases in which we have emphasized that a subdued suspect has the right not to be seized by deadly or significant force, a right which has been well-established for decades. See, *e.g.*, *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (citing cases dating back to 1995 and concluding that "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects");

*Wynalda*, 999 F.2d at 247 (concluding that an officer was not entitled to qualified immunity where he shot a fleeing suspect who no longer presented any immediate threat because "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity"); see also *Becker*, 821 F.3d at 929 (upholding a denial of qualified immunity where an officer used force on a suspect who was not fleeing, was out in the open, and had surrendered with his hands above his head); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (holding that an officer was not entitled to qualified immunity at the summary judgment stage where, at the point the officer used force, the suspect was visible to the officer and "had been motionless for upwards of ten seconds").

*Weinmann* also instructs that a dispute of fact regarding the circumstances surrounding an officer's use of force may prevent us from determining whether an individual's clearly established rights have been violated. 787 F.3d at 451. There the summary judgment record left unresolved whether a suicidal man with a gun presented an immediate threat to an officer who arrived on the scene. See *id.* at 448. Under one version of the facts, the officer's use of force would have been reasonable; under another, clearly established law would have made it unreasonable. See *id.* at 449–50. And it was this uncertainty as to a material fact that "preclude[d] a ruling on qualified immunity" on summary judgment. *Id.* at 451.

We chart the same course here. The existence of the substantial factual dispute about the circumstances and timing surrounding Minchuk's decision to shoot Strand precludes a ruling on qualified immunity at this point. This is not to foreclose the availability of qualified immunity to

Officer Minchuk at trial. At trial a jury may resolve these disputed facts in Officer Minchuk's favor, and the district court could then determine he is entitled to qualified immunity as matter of law. See *Warlick v. Cross*, 969 F.2d 303, 305 (7th Cir. 1992) ("When the issue of qualified immunity remains unresolved at the time of trial, as was the case here, the district court may properly use special interrogatories to allow the jury to determine disputed issues of fact upon which the court can base its legal determination of qualified immunity."). But we cannot make such a determination at this stage on this record.

For these reasons, we AFFIRM.