In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2378

ALIYANA M. HENNING, ESTATE OF GARRETT D. HENNING,
DEAN C. HENNING, et al.,

*Plaintiffs-Appellants,*

*v.*

TIMOTHY J. O'LEARY, MICHAEL BLASER,
SCOTT PETERSON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05 C 582—**John C. Shabaz**, *Judge.*

ARGUED JANUARY 16, 2007—DECIDED FEBRUARY 16, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* During a scuffle triggered by
his efforts to resist arrest, Garrett Henning was shot
and killed by Timothy O'Leary, a City of Janesville police
officer. Henning's daughter Aliyana, his parents, and his
estate (the Hennings) brought an action under 42 U.S.C.
§ 1983, alleging that O'Leary, two other police officers, and
the City of Janesville violated Henning's Fourth Amend-
ment rights and their right as his relatives to society
and companionship. They now appeal the district court

judge's decision granting the defendants' motion for summary judgment.

Because the Hennings are attempting to survive the motion, we take the facts in the light most favorable to their case and look to see whether there remains a genuine issue of material fact for a jury to decide. *See* Federal Rule of Civil Procedure 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Here then, are the facts. One night in October 2003, Henning visited a friend, Richard Buol, at Buol's Janesville apartment complex. Buol says the two were just hanging out and that Henning was "goofing" around like he often did when they were together. Later, as he was leaving the apartment complex parking lot around 11 p.m., a female neighbor of Buol's confronted Henning about being in the lot. A few words were exchanged, but no significant incident occurred. Henning then got in his truck and drove away. Meanwhile, the neighbor's husband called the Janesville police to report that a suspicious-looking person wearing a ski mask, leather jacket, and gloves was hanging around the parking lot before driving off in an old, silver-gray Dodge truck. Dispatch sent two officers, Michael Blaser and Scott Peterson, to investigate.

Blaser realized that he had just been trailing the Dodge truck prior to the call from dispatch, and he moved to catch up with it. Peterson went to the complex, talked with the complaining neighbor, and looked around the parking lot. The neighbors pointed out a car that did not belong there, and, after checking the registration, Peterson determined that it probably belonged to Henning's mother. He also talked with Buol. By this time both officers suspected they were dealing with Henning, who was a suspect from a shooting a few days earlier. Blaser also knew that Henning was on probation as a convicted felon found guilty of sexually assaulting a 15-year old girl.

Meanwhile, O'Leary radioed to indicate that he was following Henning, whom O'Leary stopped as he pulled into a Stop N' Go gas station to buy cigarettes. Henning rolled down his window when O'Leary approached and provided his identification. He admitted to O'Leary that he had been confronted at the apartment complex and that he had a vehicle for sale there. Peterson and Blaser arrived and continued the questioning—they had earlier agreed to give Henning a warning about trespassing rather than issue any sort of citation. Asked specifically about Buol, Henning denied having seen him before eventually admitting he had been there. Asked what he had been wearing while at the apartment, Henning told them he had on a black leather jacket but denied wearing a ski mask or having one in his car.

Having heard this, Blaser, who was on the passenger side of Henning's truck, noticed what appeared to be a ski mask crumpled inside the car, and O'Leary spotted a baseball bat on the side of the passenger seat. With this, Blaser ordered Henning out of the truck, patted him down for weapons, and directed him to sit in the back of his squad car.

At that point, Blaser says Henning gave him verbal consent to search the truck. The Hennings dispute this with circumstantial evidence: they question why Henning would authorize the search, note that the other officers were not present to hear the consent, and wonder why Blaser would not have clarified things using the written consent forms he carried with him. In any event, they searched the truck and found some pepper spray and, under the center of the dashboard, a gun—a clear violation of Henning's probation.

After finding the gun, Henning was told, as a prelude to handcuffing him, to step out from the squad car, turn around, place his hands behind his back, and spread his

legs. Henning did as directed, and Officer Blaser grabbed his right hand and told him he was under arrest. Rather than comply, Henning resisted and demanded an explanation. He made a move away from the officers and the car, at which point Peterson grabbed Henning's left hand as the two officers tried (and failed) to place him in handcuffs. Peterson grabbed Henning by the torso to try and bring him down as they called for O'Leary's help. All three officers shouted at Henning to stop resisting and put his hands behind his back. But Henning continued to fight, and even as they got him to the ground he succeeded in pushing himself up on all fours. The officers tried hand strikes, pepper spray, and baton blows to the torso and legs to get him subdued.

At some point, Peterson noticed that his gun, which had been in his holster, was no longer at his side. Frantic, he spotted the weapon on the ground underneath Henning and reached out to try and position it away from the group. But when he did this, he realized that something else was restraining the gun's movement. He noticed that Henning's hand was under his body out of view and might be on the gun, and he shouted this to the other officers.

Peterson tried reaching with his other hand and felt a finger reaching for the trigger. Henning started to roll over, pinning Peterson under his right side, and O'Leary believed the barrel of the gun was facing him. A witness (Tyler Dvorak) walking into the Stop N' Go allegedly heard one of the officers yell "drop the gun" and heard Henning say something like "don't shoot me." O'Leary says he heard Henning say "shoot me, you're going to have to shoot me." O'Leary, taking care to avoid shooting the other officers and a bystander, drew his gun and fired at Henning's midsection. Henning instantly went limp; he died from the wound a few hours later. Blood and urine samples revealed the presence of cocaine and THC in Henning's system.

The Hennings' complaint alleges that the search of Henning's truck, his arrest, and the use of excessive force against him all violated the Fourth Amendment. It also alleges that his death unconstitutionally caused his parents and daughter a loss of society and companionship.

After all the smoke is cleared away, this case comes down to the excessive force claim. No *surviving* plaintiff's constitutional rights were violated when the officers pulled Henning over, searched his truck, sought to arrest him, or used deadly force against him, as "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

Aliyana and the parents assert their own rights in bringing the loss of companionship claims, but even if those rights are constitutionally protected (a dubious proposition, at least for the parents, after *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005); *but see Smith v. City of Fontana*, 818 F.2d 1411, 1418-19 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (recognizing § 1983 cause of action against state based on substantive due process where officers' actions causing father's death deprived children of his companionship)), whether they were in fact violated turns on whether there was excessive force.

Henning's survivors might be able to step into his shoes and exercise his *remedies*, but this depends (at least in most cases) on a state's survivorship statutes. *Robertson v. Wegmann*, 436 U.S. 584, 590-91 (1978). Wisconsin recognizes claims for wrongful death (which is effectively what the excessive force claim is), and the estate or those who would recover may bring the action for the deceased plaintiff. Wis. Stat. Ann. § 895.04(1). We note that under § 895.04(2), Aliyana (but not Henning's parents) can

participate in the suit alongside Henning's estate on this basis regardless of the validity of her companionship claim.

But the other Fourth Amendment claims do not survive—at least not in this case. Asked at oral argument whether they were making a survivorship claim based on the investigatory stop and search, the Hennings conceded they were not. We thus need not consider, for example, whether the claim regarding the illegal search might be considered an invasion of privacy, a cause of action that survives a deceased plaintiff in Wisconsin. *See* Wis. Stat. Ann. § 895.01. In fact, we do not need to consider the stop and search at all, because even in conjunction with the excessive force claim, if the stop and search were illegal, Henning had no right to resist the officers' attempts to arrest him. *State v. Hobson*, 577 N.W.2d 825, 837 (Wis. 1998).

We turn then to the excessive force claim, which invokes the Fourth Amendment's prohibition against "unreasonable . . . seizures." *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Whether the force used to effectuate a seizure is reasonable is determined by looking to the particular facts and circumstances of the case and considering whether it was objectively reasonable (without the benefit of hindsight) for an officer to conclude that "the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396-97. Deadly force, which O'Leary employed in this case, is reasonable where an officer has reasonable cause to believe that the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000).

Here, there can be no doubt that O'Leary had the requisite reasonable cause. In the tense struggle that

followed Henning's refusal to submit to the officers' attempts to handcuff him, Peterson's gun got loose, and at least two officers believed Henning had his hands on or near it. Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety. Nor can they be required to take a less deadly shot where none is available that would not place someone else also in jeopardy.

The Hennings dispute the officers' characterization of the events, but they offer no real evidence to contradict it. They did not depose Dvorak (perhaps he can't be found), the only nonpolice eyewitness to what happened, and they otherwise rely only on some minor inconsistencies in the three officers' stories. Yet minor inconsistencies are not unusual—indeed exact, step by step recall of this incident by three different officers would be unusual. Absent something else, the Hennings really offer nothing to corroborate their version of the events—certainly not enough to get them to a jury. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986), and the Hennings have failed to do so.

The judgment of the district court judge is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—2-16-07