In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2837

ESTATE OF JOSEPH BIEGERT,
*by Special Administrator* TONI BIEGERT,

*Plaintiff-Appellant,*

*v.*

THOMAS MOLITOR, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-401 — **William C. Griesbach**, *Judge.*

ARGUED JUNE 4, 2020 — DECIDED JULY 31, 2020

Before SYKES, *Chief Judge*, and EASTERBROOK and BARRETT,
*Circuit Judges*.

BARRETT, *Circuit Judge*. Joseph Biegert's mother called the
police for help because she was concerned that her son was
attempting to kill himself. Officers went to Biegert's apart-
ment to check on him, and when they arrived, Biegert initially
cooperated. He began resisting, though, when the officers
tried to pat him down. A scuffle ensued, and the officers tried

to subdue Biegert with fists, Tasers, and a baton. All of these efforts to restrain Biegert failed, and Biegert armed himself with a kitchen knife. When he began to stab one of the officers, they shot him, and he died at the scene.

Biegert's mother, on behalf of his estate, argues that the officers used excessive force both by restraining Biegert during a pat down and by shooting him. The district court disagreed, concluding that the officers reasonably restrained Biegert and that they reasonably resorted to lethal force when Biegert threatened them with a knife. We reach the same conclusion, so we affirm the district court's judgment.

I.

On February 24, 2015, Joseph Biegert texted his mother that he had taken a number of pills in an apparent suicide attempt. His mother, concerned for his safety, called the Green Bay, Wisconsin, police and requested a welfare check. She told the dispatcher that Biegert was depressed, had a history of suicide attempts, was alone, and had access to neither weapons nor vehicles.

Officers Brian Krueger and Matthew Dunn were dispatched to Biegert's apartment and requested that rescue personnel prepare nearby. After they arrived, the two officers went to Biegert's apartment without first pausing to formulate a plan. As they approached the apartment, Biegert called police dispatch, expressing concern that there were strangers outside his door who he believed were going to hurt him. While Biegert was on the call, Dunn knocked on the door and announced that they were the police. The officers did not know that Biegert had called dispatch and grew suspicious when they heard him walk away from the door, rummage for

something, and return to open the door. Biegert's estate contends that the delay was due to Biegert being on the phone with dispatch.

After Biegert opened the door, he confirmed his identity and that he was depressed. He then allowed both officers into the apartment. Three pill bottles lay on the floor, and Krueger asked Biegert how many pills he had ingested, to which Biegert responded "three"—Krueger believed this may have meant three bottles' worth. Shortly after entering the apartment, Dunn and Krueger heard sounds from the bedroom and asked Biegert who else was there; Biegert said that he didn't know. Dunn conducted a protective sweep, discovering that the sound had been caused by a shade in front of an open window. During the sweep, Dunn noticed a knife block in the kitchen, but he did not secure the knives before returning to Krueger and Biegert in the living room. Though the apartment was dark, the officers did not turn on any lights, opting for flashlights instead.

According to the estate, the officers questioned and instructed Biegert aggressively and became increasingly combative as the encounter went on. Biegert, seated on the couch, put his hand in his pocket and Krueger told him to remove it. Krueger then asked Dunn to pat down Biegert for weapons to ensure the safety of the rescue personnel waiting outside, though neither believed that Biegert was either armed or unwilling to accept help. Biegert stood and put his hands behind his back as instructed. As he patted him down, Dunn held two of Biegert's fingers with one hand in a way that Dunn concedes may have been painful. While Dunn searched Biegert, Krueger advised the rescue team that they could approach the apartment.

Biegert recoiled when Dunn's pat down neared Biegert's belt, and Biegert pulled his right hand out of Dunn's grasp. Krueger then grabbed Biegert's left hand while Dunn sought to regain control of Biegert's right hand. Biegert pulled away, dragging the officers toward the kitchen. Krueger told Biegert "[d]on't do anything stupid" and tried to put Biegert in a secure hold so that he could place him in handcuffs. Dunn attempted to block Biegert with his leg, and both Biegert and Dunn fell to the floor. Biegert rose again, pulled the officers into the kitchen and all three men fell to the floor while Biegert continued to thrash against the officers.

Krueger drew his Taser and attempted to use it on Biegert, but it did not fire. When Krueger then tried to put the Taser directly against Biegert, Biegert squeezed Krueger's genitals and reached for the Taser. Krueger knocked the Taser out of Biegert's hand and began punching Biegert in the face, apparently with no effect. Dunn then drew his Taser, and although he tried to aim at Biegert, he hit Krueger instead. Once Krueger recovered from the shock, he expanded his baton and prepared to continue striking Biegert.

At this point, Biegert managed to grab a knife from the kitchen counter, and he stood over Dunn with the knife in his right hand. Biegert lunged at Dunn, who initially deflected the knife with his hand. But Biegert lunged again, cutting Dunn's right arm. Dunn drew his sidearm and yelled that Biegert was stabbing him. Krueger threw his baton to keep it from Biegert and drew his own sidearm, stepping back. Biegert stepped toward Krueger and Krueger fired. Dunn then fired and Biegert fell on his back, still holding the knife. The estate alleges that officers stopped shooting when Biegert fell, only to resume moments later. Dunn reloaded his firearm

and kept it pointed at Biegert while Biegert continued breathing for a short time. Other officers arrived to assist, and Dunn received care for two stab wounds to his upper right arm. Two minutes elapsed from the officers' knocking on Biegert's door to the shooting. Biegert died at the scene.

Biegert's mother brought this suit on behalf of her son's estate. The defendant officers moved for summary judgment and the district court granted their motion, concluding that the officers acted reasonably under the Fourth Amendment, without reaching the defendants' alternative qualified immunity argument. The district court also granted summary judgment for the defendants on Biegert's due process claim and claims against Thomas Molitor, the officers' supervisor, and other unidentified officers. Biegert appeals the grant of summary judgment with respect to Dunn and Krueger.

## II.

On appeal, Biegert's estate argues that the officers violated Biegert's Fourth Amendment right to be free from excessive force both by painfully holding his fingers and by shooting him. According to the estate, the force was unreasonable because the officers created the danger through their aggressive questioning, pat down, and failure to secure the knife block. In addition, the estate says, the officers' actions were contrary to both state law and police department policies. The estate does not challenge the reasonableness of the entry into Biegert's apartment or the seizure of Biegert.

We review the district court's grant of summary judgment de novo, construing the facts in favor of the nonmovant. *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019). We evaluate an

excessive force claim under the Fourth Amendment's reasonableness standard, which "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). Ultimately, the reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

A.

The estate contends that the officers acted unreasonably by creating the conditions that precipitated the violent encounter. As the estate sees it, the officers created the situation that ultimately led to Biegert's death by failing to make a plan for the encounter, failing to secure the knife block in the kitchen, and questioning Biegert aggressively. But none of these actions rendered the officers' subsequent use of force unreasonable, nor did the officers' creation of a dangerous situation constitute an independent violation of Biegert's constitutional rights. The officers might have made mistakes, and those mistakes might have provoked Biegert's violent resistance. Even if so, however, it does not follow that their actions violated the Fourth Amendment. *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("[E]ven if [the officers] misjudged the situation, Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'" (citation omitted)).

Only in narrow circumstances have we concluded that an officer acted unreasonably because he created a situation where deadly force became essentially inevitable. In *Starks v.*

*Enyart*, for example, we held that an officer acted unreasonably when he jumped in front of a speeding cab, after which companion officers shot the driver to prevent the officer from being struck. 5 F.3d 230, 234 (7th Cir. 1993). The officer acted unreasonably, we explained, because he created a situation in which it was impossible for a person to react in a way that would "avoid presenting a deadly threat." *Id.*

*Sledd v. Lindsay* is another example. In that case, we concluded that the officers acted unreasonably when they failed to identify themselves while forcibly entering a home to execute a search warrant in plain clothes, which resulted in their shooting a man who had armed himself thinking that the officers were intruders. 102 F.3d 282, 288 (7th Cir. 1996). We explained that "in a situation where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified." *Id.*

In *Starks* and *Sledd*, the officers acted so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions. That's not true in this case. Even if the defendants' actions exacerbated the danger, Biegert's actions were an intervening cause of the deadly force. Dunn and Krueger escalated the force that they applied in response to the force with which Biegert resisted; the situation requiring them to use deadly force was not primarily of their own making.

The estate also emphasizes that the officers violated police department regulations and that these violations bear on the officers' reasonableness. But the district court was correct to give no weight to these arguments. As we have previously

stated, § 1983 "protects plaintiffs from constitutional viola-tions, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Policies and procedures do not shed light on the reasonableness of an officer's behavior because, "even if they could be practicably assessed by a judge, [such policies] vary from place to place and from time to time," and so "[w]e cannot accept that the search and seizure protections of the Fourth Amendment are so variable." *Whren v. United States*, 517 U.S. 806, 815 (1996).

## B.

Next, the estate argues that the officers acted unreasona-bly when Dunn took hold of Biegert's fingers in a way that may have caused him pain. Restraining an individual may be appropriate in "inherently dangerous situations," even where the officers do not suspect the restrained individual of a crime. *Muehler v. Mena*, 544 U.S. 93, 100 (2005) (concluding that "the use of handcuffs minimizes the risk of harm to both officers and occupants" of the area being searched); *see also United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (con-cluding that sometimes "it may be reasonable for police to de-tain people not suspected of criminal activity themselves, so long as the additional intrusion on individual liberty is mar-ginal and is outweighed by the governmental interest in con-ducting legitimate police activities safely and free from inter-ference"). At least when handcuffs are used, however, we have emphasized that "an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009); *see also Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003)

(holding that officers acted unreasonably by twisting the arms and handcuffing "a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with … minor offenses").

Here, Dunn acted reasonably in asserting some physical control over Biegert while he conducted a pat down. Biegert was reportedly suicidal, and the officers wanted to ensure that he posed no threat to the rescue personnel. If Biegert experienced pain in the way Dunn held his fingers, he did not give the officers any indication of it. *See Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (holding that officers acted reasonably where "Tibbs complained only once … , gave the officers no indication of the degree of his pain [and], experienced minimal (if any) injury"). The officers were permitted to restrain Biegert while conducting the pat down. There is no evidence that they did so in an unreasonably painful manner, nor does the estate allege that the officers intended to hurt Biegert.

### C.

Finally, we turn to the shooting. When evaluating the reasonableness of deadly force, we focus on the danger posed by the person to whom the force was applied. This requires asking "whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). As a general matter, "[i]f the suspect threatens the officer with a weapon, deadly force may be used." *Id.* And police officers may resort to deadly force "even if a less deadly alternative is available to

the officers." *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020).

We have had a number of occasions to consider when officers may reasonably respond to a threat with deadly force. In *Henning v. O'Leary*, we concluded that it was reasonable for an officer to shoot a suspect when the officer believed the individual had armed himself with an officer's gun in the course of a "tense struggle." 477 F.3d 492, 496 (7th Cir. 2007). In trying to handcuff Henning, officers initially employed "hand strikes, pepper spray, and baton blows to the torso and legs," but Henning continued to resist. *Id.* at 494. At one point during the struggle, an officer noticed that his gun was missing from its holster. Fearing that the gun might be in Henning's possession, the officer reached beneath Henning, who was lying on his side, and felt both the gun and what he believed to be a finger reaching for the trigger. The officer then shouted to other officers on the scene, one of whom drew his own weapon and fired at Henning, killing him. We concluded that the officers acted reasonably because they did not need to wait until Henning posed an even more imminent threat than he did when reaching for the trigger. *Id.* at 496.

More recently, in *King v. Hendricks County Commissioners*, we concluded that officers reasonably used deadly force during a welfare check when a mentally unstable man "pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged" at the officers. 954 F.3d at 985. We held that the officers reasonably applied deadly force—even though they did not first attempt to use less lethal means—because King "pose[d] an immediate threat of serious harm to the officers." *Id.*

We emphasize that someone does not pose "an immediate threat of serious harm" solely because he is armed. We made that point in *Weinmann v. McClone*, which involved an officer performing a wellness check on a man who had locked himself in the garage with a shotgun on his lap. 787 F.3d 444, 447 (7th Cir. 2015). Without making any attempt to communicate with the man, the officer barged into the garage and shot him. *Id.* We held that the case turned on whether the man had threatened the officer with the shotgun—if he hadn't, it was unreasonable for the officer to shoot him. *Id.* Having a weapon is not the same thing as threatening to use a weapon. *Cf. Sanzone*, 884 F.3d at 740 (holding that officers reasonably resorted to deadly force when an armed man threatened to "fire a warning shot" and then pointed his gun at the officers).

Here, though, Biegert not only threatened to use the knife—he actually used it. By the time Biegert was shot, he had already stabbed Dunn multiple times. The officers, therefore, indisputably faced an immediate threat to their physical safety. And as in *Henning*, *King*, and *Sanzone*, the imminent threat of deadly harm posed by an aggressive, armed assailant justified the defendants' use of lethal force.

We also note that the officers did not resort to deadly force as their first line of defense to Biegert's resistance. Rather, the officers applied only mild physical force to restrain Biegert during the pat down and increased the force only as Biegert increased his physical resistance. When Biegert dragged the officers to the kitchen and onto the floor, Dunn and Krueger resorted to punches and Tasers. And when the Tasers proved ineffective, the officers continued to employ less lethal methods—fists, batons, and bodyweight—in their attempts to restrain Biegert. Only after Dunn yelled that he had been

stabbed and Biegert advanced toward Krueger with a knife did the officers employ lethal force.

We must evaluate the reasonableness of the officers' actions with the understanding that the situation they faced was "tense, uncertain, and rapidly evolving" and required them to "make split second judgements" about how much force to apply to counter the danger Biegert posed. *Graham*, 490 U.S. at 397. As in *Henning*, the officers first attempted less lethal methods in response to Biegert's resistance. And, as in *King*, Biegert posed an imminent threat to the officers once he had armed himself with a knife, attacked Dunn, and advanced toward Krueger. At this point, the officers reasonably resorted to firing at Biegert in response to the imminent threat he posed.

The estate also contends that there was a pause in the shooting—that the officers stopped shooting when Biegert ceased to pose a threat and then resumed after he had collapsed to the ground. The estate's best evidence for this theory is the audio captured by one of the officers' dash cameras. But the garbled audio, in which the officers can barely be heard over the background noise, contains no clearly audible pause. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). A dispute of fact is not genuine if "the evidence supporting [one] version of events does not rise above speculation or conjecture." *King*, 954 F.3d at 986. We must draw inferences in the estate's favor but "our favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724,

732 (7th Cir. 2008) (alteration in original) (citation omitted). Because the audio provides no support for the estate's theory and it offers no other admissible evidence, no factual issue remained that would bar summary judgment.

* * *

The officers did not violate the Fourth Amendment by shooting Biegert. Nor did their actions preceding the shooting render their use of force unreasonable. Because we conclude that no constitutional violation occurred, we need not determine whether the officers are entitled to qualified immunity. The district court's decision is AFFIRMED.