In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2843

RYAN MODERSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF NEENAH, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:21-C-272 — **William C. Griesbach**, *Judge*.

———————————

ARGUED APRIL 9, 2024 — DECIDED MAY 9, 2025

———————————

Before EASTERBROOK, ROVNER, and JACKSON-AKIWUMI,
*Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. On December 15, 2015, police officers responded to an unfolding hostage situation at Eagle Nation Cycles in Neenah, Wisconsin. According to initial reports, a lone gunman had fired a shot inside the motorcycle shop and was threatening to kill hostages within minutes. When the officers attempted to enter the shop, they were met with a hail of gunfire and heavy smoke. Men inside

the shop appeared to disregard the officers' commands as well. Suspecting an ambush, the officers retreated. As the officers regrouped outside, several hostages escaped the building. The officers handcuffed and questioned most of those hostages, and transported two of them to the police station—actions which led to this lawsuit.

Plaintiffs are three of the hostages detained that day. They sued the City of Neenah and multiple officers for violating their Fourth Amendment rights against unreasonable seizures. The district court found that Plaintiffs' detention was reasonable, so no constitutional violation occurred and, in the alternative, qualified immunity shielded the officers from liability. Plaintiffs challenge that decision and also the district court's dismissal of Sergeant Angela Eichmann from the suit—both decisions articulated in an order granting summary judgment to Defendants. We affirm.

**I**

We recount the facts in the light most favorable to Plaintiffs as the non-movant at summary judgment. *Smith v. Finkley*, 10 F.4th 725, 729–30 (7th Cir. 2021). At 8:56 a.m. on December 5, 2015, the City of Neenah Police Department alerted officers to a hostage situation at Eagle Nation Cycles. Initial reports indicated a long-haired, bearded man, dressed in a flannel shirt and armed with a MAC-10 submachine gun had taken two or three hostages. Police dispatch told the responding officers that a shot had been fired inside the building and the gunman said he would start killing hostages in five minutes.

The on-duty patrol officer, Lieutenant Shaun O'Bre, instructed the officers to form an "invisible containment"

perimeter around the building to not give away the officers' location. However, as the officers took their positions, a truck fled the scene. Dispatch advised the officers that the shooter was inside the truck, so some officers abandoned their positions and moved to intercept the vehicle.

Sergeant Angela Eichmann and another officer stopped the vehicle and identified the driver as Ethan Moderson. Ethan reported that a white male with long hair he did not recognize had held him hostage at gunpoint inside Eagle Nation, but he had escaped at the urging of his father, Plaintiff Ryan Moderson. Ethan also reported that his father was still in the building. Sergeant Eichmann questioned Ethan for approximately one minute before releasing him and returning to the perimeter.

Meanwhile, Lieutenant O'Bre learned that the individual fleeing in the truck was not the gunman, and the gunman remained inside Eagle Nation. In response, he assembled a team of officers to enter the building and free the hostages. The team prepared to breach the building believing that, because four minutes had already passed since the gunman threatened to kill hostages, people would die if the officers did not enter immediately.

The officers' attempted rescue was met with chaos. Motorcycles and mechanical equipment frustrated their entry into the building. Once in, the officers shouted: "Police," "Get down," "Get on the ground now," and "Show me your hands." Although Plaintiffs dispute this, one officer reported seeing two individuals who did not appear in distress move in opposite directions, consistent with a flanking maneuver. Then, according to the officers, came a hail of gunfire during which a cloud of smoke erupted. One officer was struck in the

helmet and yelled "I'm hit"; two more officers fell down an interior stairwell; and another officer—unable to determine the number or location of shooters—used "target-specific directed fire" to provide cover, allowing for the team's retreat from the building. Back outside, the officers surmised based on the heavy gunfire and the subjects' failure to comply with orders that they faced an ambush—not a hostage situation.

The officers then received word that two individuals were exiting the back door of Eagle Nation. The officers handcuffed both individuals, Plaintiffs Michael Petersen and Ryan Moderson. An officer transported Petersen to the Neenah Police Department and turned him over to an interview team. Meanwhile, an officer briefly interviewed Ryan Moderson before transporting him from the scene to the location of his son, Ethan. Both Modersons agreed to further interviews and voluntarily visited a nearby police station to provide written statements.

Then, three minutes after the officers retreated from Eagle Nation, another round of gunfire came from inside the building. Officers spotted an armed man, Michael Funk, run from the building, take cover behind a vehicle, and then run across the alley. Believing they had their hostage-taker, the officers shot and killed him. It turned out that Funk had been one of the hostages, not the hostage-taker.

Eventually, the hostage-taker, Brian Flatoff, exited the building and the officers arrested him. Officers also detained the final hostage, Plaintiff Steven Erato. Officers took Erato's wallet, cell phone, vehicle key, and rosary, and transported him to the Neenah Police Department. There, Erato, accompanied by counsel, was advised he was not under arrest, he was not required to answer questions, and he was free to

leave. He said he understood and agreed to an interview with police.

Ryan Moderson, Petersen (by his estate), and Erato filed suit, seeking compensatory and punitive damages from the City of Neenah and its officers for unreasonably seizing them in violation of the Fourth Amendment. The three plaintiffs later conceded that there was no basis for a claim against the City of Neenah, so the district court dismissed the city from the suit. The court also dismissed Sergeant Eichmann based on her lack of involvement in the alleged misconduct. The court granted summary judgment to the remaining officers, finding that they did not violate the Fourth Amendment, and, in the alternative, qualified immunity barred Plaintiffs' claims.

Plaintiffs now appeal.

## II

On appeal, Plaintiffs contend that the district court erred when it (1) granted summary judgment in Defendants' favor on Plaintiffs' Fourth Amendment claims; (2) dismissed Sergeant Eichmann from the lawsuit; and (3) concluded qualified immunity barred Plaintiffs' claims. Plaintiffs also argue they are entitled to punitive damages. We conduct a de novo review of a district court's summary judgment decision. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We must reverse if we find that a reasonable jury could have rendered a verdict in favor of Plaintiffs. *Madero v. McGuinness*, 97 F.4th 516, 521 (7th Cir. 2024).

**A**

We begin with Plaintiffs' Fourth Amendment claims. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees an individual the right to be free from "unreasonable searches and seizures" by the government. *Bailey v. United States*, 568 U.S. 186, 192 (2013). A police officer who "restrains [a person's] freedom to walk away … has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). We consider the totality of the circumstances to determine "whether 'a reasonable person would feel free to terminate the encounter.'" *United States v. Lopez*, 907 F.3d 472, 487 (7th Cir. 2018) (citation omitted). Here, the parties agree that, at some point on December 5, 2015, the officers seized each Plaintiff. The question is thus whether Plaintiffs' seizure was reasonable.

Our assessment of a seizure's reasonableness varies in form according to the type of seizure. Citizen-police interactions are generally categorized as consensual encounters, stops, or arrests. *United States v. Cade*, 93 F.4th 1056, 1060 (7th Cir. 2024) (citing *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015)). Consensual encounters are not seizures. *United States v. Mendenhall*, 446 U.S. 544, 553—554 (1980) ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976))). But investigative stops, also known as *Terry* stops, are seizures for purposes of the Fourth Amendment. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and

its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." (citing *Terry*, 392 U.S. at 9)). Officers use stops when they lack probable cause for arrest but nonetheless have reasonable suspicion that the suspect may be engaged in criminal activity. *Terry*, 392 U.S. at 20–23. In doing so, an officer may briefly detain a suspect to verify or dispel his suspicion. *Id.* Only when an investigative stop morphs into an arrest is probable cause required. *United States v. Olson*, 41 F.4th 792, 799 (7th Cir. 2022).

To assess the reasonableness of a seizure, whether it be an investigatory stop or an arrest, courts must "first consider whether the detention was justified at the outset." *Matz v. Klotka*, 769 F.3d 517, 524 (7th Cir. 2014). Here, for the reasons discussed below, we assume—but do not decide—that the detentions in this case amounted to *Terry* stops. A *Terry* stop is reasonable at its inception if the totality of the circumstances, including the officer's experience, would lead the officer to reasonably suspect the individual of wrongdoing. *United States v. Howell*, 958 F.3d 589, 597–98 (7th Cir. 2020). The officers seized Moderson, Petersen, and Erato during a violent hostage situation. Gunfire thwarted the officers' rescue attempt, leading them to fear multiple shooters remained inside. Against this backdrop, the officers were justified in temporarily detaining Plaintiffs after they escaped the building.

Plaintiffs argue that Defendants' seizure was not reasonable at the outset given the information that the officers received from dispatch and witnesses—information the officers had no reason to disbelieve. We cannot conclude that, faced with the chaotic situation unfolding at Eagle Nation, the officers had to bet their lives on the accuracy of reports about a lone gunman. *See, e.g.*, *United States v. Williams*, 731 F.3d 678,

685–86 (7th 2013) (explaining officer's stop of suspect was justified despite discrepancies between 911 call and scene upon arrival). Even if the officers relied on initial descriptions of the hostage-taker and did not believe Plaintiffs were hostage-takers or shooters, the danger inherent in the situation justified Plaintiffs' detentions. *Est. of Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) ("Restraining an individual may be appropriate in 'inherently dangerous situations,' even where the officers do not suspect the restrained individual of a crime.") (citation omitted). Thus, the seizures were lawful at their inceptions.

Still, even a seizure that is justified at the outset may transform into a violation of the Fourth Amendment if "the manner of execution unreasonably infringes" on the detainee's constitutional rights. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citation omitted). For example, a seizure may become unlawful "if it is prolonged beyond the time reasonably required to complete [its] mission." *Id.*; *see also Matz*, 769 F.3d at 524 (explaining that the seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place" (quoting *Terry*, 392 U.S. at 20)); *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (explaining that detention is reasonable when the "intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference"). Here, as Defendants argue, the record shows the officers had a straightforward mission for the investigatory stops: (1) ascertain the identity of people leaving the scene before they were lost to the officers; (2) determine whether anyone else had firearms and, if so, how many; and (3) investigate the situation without interference from those stopped. With these officer objectives in mind, we review the

experience of each Plaintiff to determine whether their seizure extended beyond the time necessary to accomplish the mission.

We begin with Moderson who, of the three plaintiffs, experienced the least intrusive contact with police. We conclude that Moderson's detention constituted a reasonable investigatory stop. The parties do not dispute that Moderson's seizure began when the officers handcuffed him and ended when they reunited him with his son. Plaintiffs point to no evidence establishing that the officers held Moderson longer than the time necessary to confirm or dispel the suspicion that Moderson was the hostage-taker or a shooter. Nor do Plaintiffs present evidence to meet Defendants' record support for their contention that detaining Moderson allowed them to continue their investigation. We further conclude that Moderson's visit to the police department and subsequent statements were part of a consensual encounter with law enforcement. Plaintiffs point to nothing in the record suggesting that Moderson did not feel free to decline to do these things.

As for Petersen and Erato, we conclude their Fourth Amendment claims fail, too. Without deciding the exact start and end points of the seizures, we assume that Petersen and Erato were seized when officers detained them and were no longer seized sometime after the officers handed them over to interviewers. We need not decide whether the record supports Petersen and Erato's Fourth Amendment claims, though, because Plaintiffs do too little to develop their position on appeal. In their opening brief, Plaintiffs say Defendants "detained [them] without probable cause" and "arrested [them] without probable cause." But they do not raise an argument that their detentions amounted to arrests. Plaintiffs

also do not mention *Terry* or investigatory stops, and they opted not to file a reply brief, forgoing the opportunity to respond to the specific *Terry* arguments detailed in Defendants' response brief. *See Brockett v. Effingham Cnty.*, 116 F.4th 680, 686–87 (7th Cir. 2024) ("Therefore, arguments that are underdeveloped, cursory, and lack supporting authority are waived." (cleaned)); *United States v. Valenzuela*, 931 F.3d 605, 608 (7th Cir. 2019) (concluding argument was "woefully underdeveloped" because it cited a case "without explaining or defending its rationale" or "even attempt[ing] to wrestle" with the "complicated question").

We express no opinion on whether the officers needed to handcuff Petersen, transport him in a police vehicle to a police station, and hand him over to an interview team to complete their stated mission of ascertaining Petersen's identity, determining whether Petersen had a firearm, and investigating the situation without interference. *See United States v. Bullock*, 632 F.3d 1004, 1016–17 (7th Cir. 2011) ("We have previously found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances …. [But] in some situations, maintaining the status quo while obtaining more information … might be the most reasonable action to take." (internal quotation marks omitted)). We also express no opinion on whether, to get Erato's name, check if he had a gun, and investigate the scene without his interference, the officers needed to handcuff him, take his belongings, transport him in a police vehicle to a police station, and interview him. And we express no opinion on whether Petersen or Erato's detentions morphed into full-blown arrests. In the end, it does not matter whether the record supports these conclusions because the

skeletal arguments on which Plaintiffs rely are insufficient to support their Fourth Amendment claims. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived …."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." (citation omitted)).

We affirm the grant of summary judgment to Defendants on Plaintiffs' Fourth Amendment claims. Because no constitutional violation occurred, we need not reach Plaintiffs' argument that they are entitled to punitive damages.

**B**

Next, we consider Sergeant Eichmann's dismissal from this suit. A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation. *Hildebrandt v. Ill. Dep't Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). Here, Plaintiffs failed to present evidence of a causal connection between the alleged Fourth Amendment violation and Sergeant Eichmann's conduct. Eichmann participated in two detentions—that of Ethan Moderson and George Fuerte—and neither is party to this action any longer. Plaintiffs nonetheless press that Sergeant Eichmann should not be dismissed because she was "in charge of the operation" and failed to relay the description of the hostage-taker she received from Ethan Moderson to the officers at Eagle Nation. However, Plaintiffs do not present evidence supporting this information-chain theory; nor do they provide evidence demonstrating that Sergeant Eichmann had a hand in the decision to detain any of them. We therefore affirm the district court's order dismissing Sergeant Eichmann from this action.

**C**

Finally, Plaintiffs argue that the district court erred in granting qualified immunity to the officers. Because we conclude that Plaintiffs' claims are without merit, we do not reach the question of qualified immunity. *See Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024) ("We conclude that the First and Fourteenth Amendment claims are without merit. This also means we need not reach the qualified immunity question.").

**III**

Accordingly, we AFFIRM the district court's decision.